

CHIEF JUSTICE
JAMES T. WORTHEN

JUSTICES
SAM GRIFFITH
DIANE DeVASTO

CLERK
CATHY S. LUSK

CHIEF STAFF ATTORNEY
MARGARET HUSSEY

# TWELFTH COURT OF APPEALS

Tuesday, May 31, 2005

Mr. R. Brent Cooper
Cooper & Scully, P C
900 Jackson Street
Suite 100
Dallas, TX 75202

Mr. C. Michael Moore
Locke Liddell & Sapp LLP
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776

Mr. Rodney E. VanAusdal
Iwan Cray Huber Horstman &
VanAusdal, LLC
303 West Madison
Suite 2200
Chicago, IL 60606

RE:   Case Number:              12-04-00259-CV
      Trial Court Case Number:  2003-42-CCL2

Style: PHC-Minden, L.P. d/b/a Minden Medical Center
       v.
       Kimberly-Clark Corporation

Enclosed is a copy of the Memorandum Opinion issued this date in the above styled and numbered cause. Also enclosed is a copy of the court's judgment.

Very truly yours,

CATHY S. LUSK, CLERK

By: *Katrina McClenny*
     Katrina McClenny, Chief Deputy Clerk

CC:   Hon. F. Alfonso Charles
      Hon. John Ovard
      Ms. Barbara Duncan

# NO. 12-04-00259-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *PHC-MINDEN, L.P.*<br>*D/B/A MINDEN MEDICAL CENTER,*<br>*APPELLANT* | *§* | *APPEAL FROM THE* |
| *V.* | *§* | *COUNTY COURT AT LAW NO. 2 OF* |
| *KIMBERLY-CLARK CORPORATION,*<br>*APPELLEE* | *§* | *GREGG COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Appellant PHC-Minden, L.P. d/b/a Minden Medical Center ("MMC") appeals the trial court's order denying its special appearance. MMC presents four issues. We affirm.

## BACKGROUND

After Jajah Eddington's death, her family and the representative of her estate (collectively, the "plaintiffs") filed a wrongful death and survivorship action against Kimberly-Clark Corporation. According to the original petition, Eddington became ill and sought diagnosis and treatment at MMC located in Minden, Louisiana. Eddington was instructed by physicians at MMC to follow up with her primary doctor in the next week if she did not feel better. Several days later, Eddington was admitted to Good Shepherd Medical Center in Longview, Texas. However, the plaintiffs alleged, Eddington's condition deteriorated to the point where her life could not be saved.

Eddington suffered from an infection that was the result of toxic shock syndrome, which the plaintiffs alleged was caused by her use of Kotex tampons manufactured, sold, distributed, or otherwise marketed by Kimberly-Clark. Kimberly-Clark filed a third-party action against MMC, among others, alleging that MMC had violated its duty of care to Eddington, which resulted in her

death. In response, MMC filed a special appearance and, subject to that special appearance, an original answer to the third-party action.

As a result of the third-party action and special appearance, Kimberly-Clark and MMC conducted extensive discovery, including depositions. After a hearing, the trial court denied MMC's special appearance and found that the court had general jurisdiction over MMC. This appeal followed.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In its first issue, MMC argues that the trial court erred in failing to make findings of fact and conclusions of law, as requested, concerning its denial of MMC's special appearance. Rule 28.1 of the Texas Rules of Appellate Procedure provides that in appeals from interlocutory orders "[t]he trial court need not, but may–within 30 days after the order is signed–file findings of fact and conclusions of law." TEX. R. APP. P. 28.1; *Hoffmann-La Roche, Inc. v. Kwasnik*, 109 S.W.3d 21, 26 (Tex. App.–El Paso 2003, no pet.). Because this is an interlocutory appeal, the trial court was not required to file findings of fact and conclusions of law. Therefore, it did not err by failing to do so. Accordingly, we overrule MMC's first issue.

## SPECIAL APPEARANCE

In its second issue, MMC argues that the trial court erred by denying its special appearance because the evidence regarding the quality of MMC's Texas contacts is legally and/or factually insufficient to support a finding of general jurisdiction. In its third issue, MMC contends that the trial court erred by denying its special appearance because the evidence regarding the quality of MMC's Texas contacts, through its parent corporation Province Healthcare Company ("Province"), is legally and/or factually insufficient to support general jurisdiction. In its fourth issue, MMC argues that the trial court erred by denying its special appearance because maintenance of this suit in Texas offends traditional notions of fair play and substantial justice.

### Standard of Review

The plaintiff has the burden to plead a prima facie showing of jurisdiction. *Haught v. Agricultural Prod. Credit Ass'n*, 39 S.W.3d 252, 256 (Tex. App.–Tyler 2000, no pet.). In a special appearance, the nonresident defendant has the burden of proof to negate all bases of personal

jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985). On appeal, we determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony. TEX. R. CIV. P. 120a; *De Prins v. Van Damme*, 953 S.W.2d 7, 18-19 (Tex. App.–Tyler 1997, writ denied). Whether a court has personal jurisdiction over a defendant is a question of law and, therefore, our review is de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Where, as here, a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Id.* at 795. When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appellate court. *Id.*

For legal sufficiency issues, if there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.* When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Texas Dep't of Public Safety v. Williams*, 76 S.W.3d 647, 650 (Tex. App.–Corpus Christi 2002, no pet.) (citing *Kindred v. Con Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). The test for "more than a scintilla of evidence" is that if reasonable minds cannot differ from the conclusion, then the evidence offered to support the existence of a vital fact lacks probative force, and it will be held to be the legal equivalent of no evidence. *Id.* In our factual sufficiency review, we may reverse the decision of the trial court only if its finding is so against the overwhelming weight and preponderance of the evidence as to be clearly erroneous and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Haught*, 39 S.W.3d at 256.

**In Personam Jurisdiction**

Texas courts may exercise jurisdiction over nonresidents if they voluntarily submit to jurisdiction or if they may be held to answer under the state's long-arm statute. *Allianz Risk Transfer (Bermuda) Ltd. v. S.J. Camp & Co.*, 117 S.W.3d 92, 95 (Tex. App.–Tyler 2003, no pet.); *see Moore v. Elektro-Mobil Technik GMBH*, 874 S.W.2d 324, 328 (Tex. App.–El Paso 1994, writ denied). The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041-.045 (Vernon 1997); *Marchand*,

3

83 S.W.3d at 795. Before a Texas court may exercise jurisdiction over a nonresident defendant, two conditions must exist: (1) the Texas long-arm statute must authorize the exercise of jurisdiction and (2) the exercise of jurisdiction must be consistent with federal and state guarantees of due process. *See Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990). The Texas long-arm statute states as follows:

> In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
>
> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2) commits a tort in whole or in part in this state; or
>
> (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Vernon 1997). The broad language of Section 17.042 extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit. *Allianz Risk Transfer (Bermuda) Ltd.*, 117 S.W.3d at 95; *Marchand*, 83 S.W.3d at 795. In determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction, we rely on precedent from the United States Supreme Court and other federal courts, as well as our own state's decisions. *Marchand*, 83 S.W.3d at 795.

Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945)). A defendant should not be subject to a foreign court's jurisdiction based on "random," "fortuitous," or "attenuated" contacts. *Id.* A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *Id.* Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established "minimum contacts" with the forum state. *Id.* The foreseeability critical to a due process analysis is that the nonresident defendant's conduct and connection with the forum state are such that it

4

should reasonably anticipate being haled into court there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980)).

Once it has been determined that the nonresident defendant purposefully established minimum contacts with the forum state, the contacts are evaluated in light of other factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991). These factors include (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S. Ct. at 564; *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184; *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S. Ct. 1026, 1033-34, 94 L. Ed. 2d 92 (1987)). However, even if the nonresident defendant has purposefully established minimum contacts with the forum state, the exercise of jurisdiction may not be fair and reasonable under the facts in a particular case. *Id.* Moreover, federal authority indicates that "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed—to assess whether they satisfy the 'continuous and systematic' standard." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569-70 (2d Cir. 1996)). However, some Texas cases have implied that the relevant contacts are those up to the time of injury. *See Scott v. Huey L. Cheramie, Inc.*, 833 S.W.2d 240, 242 (Tex. App.–Houston [14th Dist.] 1992, no writ); *Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 45 (Tex. App.–Houston [14th Dist.]), *writ ref'd n.r.e.*, 699 S.W.2d 199 (Tex. 1985).

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific or general jurisdiction. *Marchand*, 83 S.W.3d at 795-96. Specific jurisdiction is established when the cause of action arises out of or relates to the nonresident defendant's contact with the forum state. *Id.* at 796; *Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 227. In contrast, general jurisdiction is present when a defendant's contacts in a forum are continuous and

systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Marchand*, 83 S.W.3d at 796.

### "Single Business Enterprise Theory"

Texas law presumes that two separate corporations are distinct entities. *Marchand*, 83 S.W.3d at 798. However, personal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's "doing business" to the subsidiary. *Id.* The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation. *Id.*

The "single business enterprise theory" is based on equity and arises from partnership principles. *El Puerto de Liverpool v. Servi Mundo Llantero*, 82 S.W.3d 622, 636 (Tex. App.–Corpus Christi 2002, pet. dism'd w.o.j.). The theory applies when corporations are not operated as separate entities, but rather integrate their resources to achieve a common business purpose. *Id.* at 636-37. Factors relevant to determining whether a single business enterprise is present include (1) common employees, (2) common offices, (3) centralized accounting, (4) payment of wages by one corporation to another corporation's employees, (5) common business name, (6) services rendered by the employees of one corporation on behalf of another corporation, (7) undocumented transfers of funds between corporations, and (8) unclear allocation of profits and losses between corporations. *Id.* at 637. Moreover, the "single business enterprise theory" is not synonymous with the doctrine of "alter ego." *North American Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 119 (Tex. App.–Beaumont 2001, pet. denied). Although the "alter ego" theory and the "single business enterprise theory" are both equitable theories, an important distinction is that the "alter ego" theory generally involves proof of fraud, i.e., proof that the corporation is organized and operated as merely a tool or business conduit of another corporation. *Id.* However, to recover under a finding of a "single business enterprise theory," no proof of fraud is required. *Id.*

### Analysis

We must first decide whether the relationship between MMC and Province is one that would allow the trial court to impute Province's "doing business" in Texas to MMC. *See Marchand*, 83

6

S.W.3d at 798.

*Single Business Enterprise Theory*

The record reveals that Province owns hospitals in Texas and, thus, does business in Texas. MMC was organized as a partnership known as PHC-Minden, L.P. under the laws of the State of Louisiana and has been a wholly-owned subsidiary of Province since October 1, 1999. Province Healthcare is listed at the top of MMC's organizational chart. In Province's organizational chart, two Texas hospitals are listed—one in Palestine and one in Mexia.

**1.** *Common employees.* George French is MMC's Chief Executive Officer. French's immediate supervisor is Tom Pemberton, Province's Regional Vice President for the eastern region. For purposes of this analysis, we consider Pemberton a common employee of Province and MMC. Donna Carter, MMC's Chief Nursing Officer and Risk Manager, considers herself an employee of both MMC and Province. Although MMC Chief Financial Officer Patty Doles considers herself an employee of Province, French considers himself an employee of MMC. From this evidence, it is unclear if French and Doles are common employees even though Carter believes she is a common employee of Province and MMC.

**2.** *Compensation of employees.* French, Doles, and Carter are paid by Province. Their salaries are intercompany payables to Province. French and Doles also have Province stock options. The evidence does not show that French, Doles, or Carter perform any duties for Province. All other MMC employees are paid by MMC.

**3.** *Common name.* The record does not show that MMC and Province share a common name. However, MMC's partnership name and initials, PHC-Minden, L.P., can be construed as a reference to Province Healthcare Company.

**4.** *Services provided to MMC by Province.* French, Doles, and Carter direct the day-to-day operations of MMC. Province employees help MMC manage its day-to-day business, if needed. Province provides MMC with advice and support, benefit assistance, negotiation and contract assistance, and legal support. Province provides a liason to help MMC make decisions regarding materials to be purchased via a Health Trust Purchasing Contract. This contract allows MMC to take advantage of group buying power by joining efforts with other Province hospitals and using specific vendors contracted to Province.

The record does not contain any evidence relating to the remaining factors discussed in *El Puerto de Liverpool* (common offices, centralized accounting, undocumented fund transfers, and unclear allocation of profits and losses). However, other evidence provides additional insight into Province's involvement in MMC's operations.

5.     *Revenues and expenditures.* MMC and Province have separate bank accounts and MMC reconciles its own accounts. However, all cash received by MMC is deposited into accounts that Province "sweeps" daily, weekly, or monthly. Province sweeps the accounts of those monies not necessary for MMC's daily activity. MMC must create a capital request for Province's regional office that, in turn, determines each hospital's allocation. Province allocates approximately four percent of MMC's net revenues for its needs, although MMC attempts to fund its acquisitions internally. Further, Province provides funds to MMC for capital acquisitions. Although MMC prepares its own "tax package," that package is sent to Province who files MMC's tax returns. MMC's general liability policy and employee group health policy are paid by Province. All of those expenses are paid back to Province by MMC.

MMC's Chief Executive Officer (French) is authorized to approve expenditures up to $10,000. Any expenditure above that amount must be approved by Province. Further, Province must approve all property improvements, all contracts with physicians, and all contracts over $25,000. The record includes a Province contract review certificate in which the regional vice president and the senior vice president and general counsel of Province approved an amendment to MMC's contract with The Schumacher Group of Louisiana, Inc. The chief executive officer of PHC-Minden, L.P. also signed under the heading "[H]ospital."

6.     *Policy formulation and goals.* MMC sets its own policies regarding the delivery of health care to its patients, has its own Board of Governors, and coordinates its own accreditation. Occasionally, Province will peruse proposed revisions or amendments to MMC's bylaws prior to its submission to MMC's Board of Governors. Although the record does not show that Province reviews MMC's policies and procedures, the preamble and definitions to MMC's medical staff bylaws, rules, and regulations, revised as of October 12, 2002, refer to MMC as "Province Healthcare's PHC-Minden, L.P. d/b/a Minden Medical Center." MMC's financial goals are its responsibility even though these goals are discussed with Province. In turn, Province conducts an

8

audit to determine if MMC will be able to meet its proposed goals.

Monthly Operational Review meetings are held at MMC. Attendees on site include French, Doles, Carter, MMC's business office manager, and MMC's director of quality management. Pemberton and Province's Regional Chief Financial Officer, Robert Wampler, attend by teleconference. In these meetings, topics discussed include MMC's operations, financial performance, physician recruitment, volume statistics, and completion of strategic initiatives. Province also offers suggestions of "best practices" and how to implement these practices.

*7. Recruitment.* Any physician recruited by MMC must sign an agreement provided by Province and be approved by Province. Province advised MMC regarding the establishment of the physician incentive program because of its expertise in legal and reimbursement areas. Moreover, Province shares with MMC and other Province hospitals the names of physicians who contact its website.

In summary, the record shows that Province and MMC have at least one common employee and that Province pays certain MMC employees, although the salaries are intercompany payables. The names of the two companies are similar, and Province employees provide various services to assist MMC in its operations. Province exercises control over MMC's revenues and expenditures and oversees MMC's operations, financial performance, and completion of strategic initiatives. Further, Province audits MMC's financial goals to determine if MMC will be able to meet these goals. Considering the totality of this evidence, we conclude that Province and MMC have integrated their resources to achieve a common business purpose. *See El Puerto de Liverpool*, 2 S.W.3d at 636-37. Having done so, Province and MMC operate as a single business enterprise.

### Minimum Contacts

Having found that Province and MMC operate as a single business enterprise, the relationship between Province and MMC is such that we can impute Province's "doing business" to MMC. We must now examine both Province and MMC's contacts with Texas. As noted above, Province owns hospitals in Texas and, thus, does business in Texas and has since October 1, 1999.

Carter attended interregional meetings that individuals from Province hospitals in Texas have attended, including a seminar in Tennessee sponsored by Province. Carter and one other MMC employee attended a Province-sponsored seminar in Dallas in the summer of 2002, which was also

attended by employees of Province-owned hospitals in Texas. Further, Carter and 40 to 45 MMC employees attended an August 2003 meeting in Dallas, which was sponsored by Province. This meeting was also attended by employees of Province-owned hospitals in Texas.

MMC has treated approximately 500 patients since October of 1999 from outside its primary or secondary service area out of a total of approximately 50,000 patients per year or 200,000 over the past four years. Of the total patients treated by MMC since October 1, 1999, .009 percent had Texas residence addresses. MMC has never had a Texas physician on staff nor does MMC advertise in Texas. MMC does not own property in Texas and does not pay Texas taxes. On March 27, 1997, MMC, among others, was sued in Dallas County, Texas. However, on April 4, 1997, the plaintiff nonsuited its claims.

In response to a request for all documents reflecting MMC's purchases from Texas vendors or from non-Texas vendors who do business in Texas, MMC produced a list of vendors with Texas addresses from which MMC made a purchase or to which MMC had issued a check since October 1, 1999. The vendor list included the total amount paid by MMC to the entity since October 1, 1999 and enumerated 205 entities with Texas mailing or physical addresses. However, patient refunds accounted for 51 of these payments from MMC, and 46 of the vendors were paid nothing. An additional eighteen vendors had Texas mailing addresses, but were physically located in another state, and six were duplicates of another vendor. Payments to the 84 remaining Texas vendors ranged from $12.97 paid to Good Old Days in Big Sandy, Texas to $515,650.15 paid to Alcon Laboratories, Inc. in Dallas, Texas. Payments to twenty-one vendors were in excess of $10,000. In all, payments to vendors with a Texas address totaled approximately $1,514,467.47.

As evidence of continuous and systematic contacts, Kimberly-Clark pointed to three contracts between MMC and Texas entities. MMC contracted with Cox Business Services or Cox Communications for cable television services. Cox Communications is located in Tyler, Texas. The contract was signed by Doles on September 23, 2003. A relevant continuous contact in this analysis includes those contacts over a period up to the date of injury, December 10, 2000, or up to and including the date suit commenced, February 28, 2003.[1] *See Metropolitan Life Ins. Co.*, 84 F.3d

---

[1] Plaintiffs' filed their original petition against Kimberly-Clark on January 8, 2003 and Kimberly-Clark filed their third party petition against MMC on February 28, 2003. For purposes of this analysis, we determine that

at 569-70; *Scott*, 833 S.W.2d at 242; *Middleton*, 687 S.W.2d at 45. This contact occurred not only after the date of injury, but after the date suit commenced. Therefore, this contact is not relevant.

Second, MMC entered into a professional services contract with Horizon Radiology, P.A. whereby Horizon would provide interpretations of CT scans for patients at MMC. Horizon is located in The Woodlands, Texas. The original agreement was signed in April of 2001 and renewed in 2002 and 2003. The 2001 contract was approved by the senior vice president and general counsel of Province. This contact, however, is relevant because it is a continuous contact occurring before the date of injury, December 10, 2000, and up to and including the date suit was filed, February 28, 2003. Third, in July of 2002, MMC contracted with Lone Star Research for a one-time survey of 200 adult residents of Minden's service area. MMC paid Lone Star $5,200 for the survey. Lone Star Research is located in The Woodlands, Texas. Although not continuous, this contact is relevant because it occurred after the date of injury, but before suit was filed.

The evidence shows that MMC, through Province, does business in Texas. While this evidence alone is more than a scintilla of evidence, the evidence discussed above shows that MMC has continuous and systematic contacts with Texas. Because Province does business in Texas and MMC has established continuous and systematic contacts with Texas, we conclude that there is more than a scintilla of evidence to support the finding that MMC has purposefully established minimum contacts with Texas. *See Marchand*, 83 S.W.3d at 795. Moreover, we conclude that the decision of the trial court was not so against the overwhelming weight and preponderance of the evidence as to be clearly erroneous and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Therefore, we conclude that the trial court did not err in denying MMC's special appearance. Accordingly, we overrule MMC's second and third issues.

### *Fair Play and Substantial Justice*

Having held that MMC has established minimum contacts with Texas, we now turn to whether the assertion of personal jurisdiction over MMC comports with fair play and substantial justice. *See Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 228. MMC is located near the border of Texas and is owned by a large corporation that does business in Texas. Further, as noted

---

Footnote continued.
the date suit commenced is February 28.

11

above, Province provides MMC with legal support. The burden, if any, on MMC to defend the case in Texas is minimal. Clearly, Texas has an interest in adjudicating the original dispute because the plaintiffs are citizens of Texas. The plaintiffs have an interest in obtaining relief in their home state using its laws. The interstate judicial system has an interest in resolving this dispute in Texas, not over several states in different suits. Because the burden on MMC to defend the case in Texas is minimal and the other factors favor adjudication in Texas, we conclude that there is more than a scintilla of evidence to support a finding that the assertion of personal jurisdiction comports with fair play and substantial justice. *See id.* Moreover, we conclude that the decision of the trial court was not so against the overwhelming weight and preponderance of the evidence as to be clearly erroneous and manifestly unjust. *See **Cain**,* 709 S.W.2d at 176. Because maintenance of this suit in Texas does not offend traditional notions of fair play and substantial justice, we conclude that the trial court did not err in denying MMC's special appearance. Therefore, we overrule MMC's fourth issue.

## DISPOSITION

The ***order*** of the trial court is ***affirmed***.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered May 31, 2005.
*Panel consisted of Worthen, C.J., Griffith, J. and DeVasto, J.*

(PUBLISH)

12



# COURT OF APPEALS

## TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 31, 2005**

**NO. 12-04-00259-CV**

**PHC-MINDEN, L.P. D/B/A**

**MINDEN MEDICAL CENTER,**

Appellant

V.

**KIMBERLY-CLARK CORPORATION,**

Appellee

---

Appeal from the County Court at Law No. 2
of Gregg County, Texas. (Tr.Ct.No. 2003-42-CCL2)

---

THIS CAUSE came to be heard on oral argument, the appellate record, and briefs filed herein, and the same being inspected, it is the opinion of this Court that there was no error in the order.

It is therefore ORDERED, ADJUDGED and DECREED that the order of the court below **BE IN ALL THINGS AFFIRMED** and that all costs of this appeal are hereby adjudged against the appellant, **PHC-MINDEN, L.P. D/B/A MINDEN MEDICAL CENTER**, for which execution may issue, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.*